# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08-0120-CV-W-GAF** |
| | ) | |
| **ALLEN R. DAVISON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Defendant, Allen R. Davison, is a certified public accountant and an attorney, who is an active member of the Nebraska bar. (Tr. 186:19-25). Davison received his undergraduate degree and law degree with honors from the University of Nebraska. (Tr. 174:13-175:25). Since at least the mid-1990's, Davison has advised on tax-related matters and promoted tax-fraud schemes. He has had "hundreds of clients in thirty years of practice." (Tr. 223:7-14). He started his career at Coopers and Lybrand's Omaha office, moved to its Kansas City office, and then ultimately moved to Grant Thornton's Kansas City office, where he became a partner in the tax practice group. (Tr. 176:22-177:1; 177::23-178:2; 178:20-180:1). Davison left Grant Thornton in October of 2001, but continued to provide tax advice to clients. (Tr. 187:19-188:1). He became affiliated with Cheryl Womack's enterprises where he held an executive position and provided her with financial and tax advice until 2004, and then worked with Womack's enterprises as a contractor. (Tr. 188:10-189:1; 190:15-192:11; 392:5-14).

Davison has promoted several tax arrangements that involve sham companies and bogus deductions. Davison orchestrated these arrangements, including the creation of these companies. Davison knew at the time the companies were created and thereafter that the companies were shams

created for the purpose of illegal tax avoidance. Davison did not intend for these companies to be operated in a legitimate fashion and knew that they were not intended by his clients to be operated in a legitimate fashion under the tax code. Nevertheless, Davison has deliberately promoted these arrangements and repeatedly advised his clients that each arrangement is a legal way to reduce tax liability.

Davison promoted a parallel C management company arrangement in which an operating company that elects sub-chapter S status (pass-through entity) makes purported management-fee payments pursuant to a recurring-item exception deduction under I.R.C. §461(h) to a management company with a staggered tax year. These "fees" were only sham journal entries, and the management company had no business purpose or economic substance. The management company claimed between $50,000 and $100,000 in income, in order to leverage the lower corporate tax rates. This arrangement results in a permanent deferral of income. Davison also promoted an ESOP-S arrangement, which functions similarly to the parallel C arrangement, except that the management company is an S corporation whose shares of stock are owned by an employee stock ownership plan. Here, too, the management company received no actual fees, but, because it is an S corporation, it does not report specific income on its return. Rather, the purported income passes through to its sole shareholder, the ESOP, where it accrues tax-free. Davison also promoted a Roth IRA-C arrangement, which follows the parallel C arrangement, except that the shares of the management company, which is also a C corporation, are owned by a Roth IRA, and the management company receives actual funds (as opposed to only journal entries), which then pass to the Roth IRA as purported dividends. Davison similarly promoted a sham 412(i) pension plan that also involves the formation of a sham entity that purports to sponsor a 412(i) pension plan that deliberately excludes

an operating business' rank and file employees in contravention of well-established laws. Davison promoted a sham flock contract arrangement in which he advised clients to execute these contracts and then claim farmer-related deductions on their individual tax returns. His clients, however, are not farmers within the meaning of the Code, and not entitled to claim these deductions. (Tr. 29:25-56:24; 89:3-104:24; PX 297, 298, 299, 300, 303).

The IRS estimate that Davison's tax-fraud schemes have cost the United States at least $45 million in uncollected revenues is found to be a reasonable estimate. (Tr. 121:20-131:6; PX 304, 305, 306). James Ley, the revenue agent who began the 6700 investigation nearly seven years ago, testified that "the IRS' resources that were being used to discover and combat these transactions was just staggering." (Tr. 28:25-29:4). Mr. Ley's testimony in this regard is credible. Davison's numerous and complex tax arrangements, coupled with his designs to disguise his true role in promoting these tax-fraud schemes, have all compounded the difficulty of deciphering these arrangements. Davison has flouted the law in a misguided and intentional attempt to assist his clients in illegal tax avoidance. The harm caused by Davison's actions is enormous.

Section 7402 of the Code provides a court with the authority to take action as necessary or appropriate to enforce the internal revenue laws. 26 U.S.C.A. §7402(a), *see also United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984). The language of this statute is broad and manifests "a Congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws." *Brody v. United States*, 243 F.2d 378, 384 (1st Cir. 1957). This includes issuance of an injunction "as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C.A. §7402(a).

The traditional factors for considering whether an injunction should issue are (1) the likelihood that a plaintiff will sustain irreparable injury in the absence of an injunction; (2) the balance between such harm and the injury that granting the injunction will inflict on other parties litigant; (3) whether the plaintiff has succeeded on the underlying merits of the case; and (4) the public interest. *United States v. Ernst & Whinney*, 735 F.2d at 1300; *see also Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

Here, all of these factors militate in favor of the Court issuing a comprehensive injunction under I.R.C. §7402. First, the government and the public fisc have suffered and will continue to suffer irreparable harm if Davison is not enjoined. Second, the balance between the harm to the government and the integrity of the tax laws balanced against the harm to Davison weighs in favor of the government. Third, the government has succeeded on the merits of its case, showing with overwhelming evidence that Davison has long engaged in serious misconduct that interferes with enforcement of the internal revenue laws. Finally, the public interest is necessarily aligned with the government's interest. An injunction that bars Davison from providing tax advice in the manner that he has, is in the public interest, especially given the tax harm estimates stemming from Davison's promotion of his tax-fraud schemes, coupled with the substantial IRS resources needed to detect and respond to these tax-fraud schemes. Furthermore, Davison's record establishes that this cycle will continue unless he is barred from providing tax advice without significant restraint.

For nearly fifteen years, Davison has promoted a substantial number of unlawful tax arrangements that involve sham companies, bogus deductions, and fabricated documents. James Ley, the revenue agent who spearheaded this investigation, testified about its magnitude: "literally dozens of revenue agents were involved in conducting the income tax examinations," and the IRS

was "dealing with literally hundreds of returns involving multiple tax years." (Tr. 29:6-13). To this end, IRS revenue agents also interviewed dozens of Davison's clients and logged hundreds of hours reviewing underlying paperwork that purported to justify sham transactions, all in an effort to unravel Davison's exceedingly complex tax arrangements. And for each and every examination, as revenue agent Lindsay Carlson has explained, the IRS must conduct a time versus benefit analysis to ensure the best use of its limited resources. (Tr. 866:24-867:14). An injunction is necessary and will "avoid[] the drain on the resources of the IRS required by auditing individual accounts, a multiplicity of suits on the same issue against individual taxpayers, and piecemeal litigation, all of which would only encourage violations in the doubtless accurate belief that the IRS would be unable to detect and pursue every taxpayer in violation." *United States v. Buttorff*, 761 F.2d 1056, 1064 (5th Cir. 1985).

Davison has concocted numerous and complex tax-fraud schemes, including the parallel C; ESOP-S; Roth IRA-C; and a sham 412(i) pension plan, which all involved the creation of sham companies. Davison also advised clients to execute sham flock contracts in order to claim farmer-related deductions on their tax returns, notwithstanding the fact that none of these clients are actually small farmers within the meaning of the Code. For a couple of years, Davison advised his clients to claim a disabled access credit on grounds that they had made improvements to their businesses in accordance with the Americans with Disabilities Act, even though they made no such improvements and did nothing more than write his company, Handicapped Assistance Business Directory, an $11,000 check; his company purportedly provided telephone assistance for blind individuals. (Tr. 239:4-241:14; PX 31, 206). Davison also promoted a tax arrangement in which he advised a client, Mr. Lauerman, to inflate the basis in the shares of stock he held in his company

at the time of sale, because of a purported contingent liability, even though there was neither legal nor factual support for this position. Davison also advised clients about a sham lease buyback program and about the bogus use of non-compete agreements as a way to reduce employee salaries and eliminate related employment taxes. (Testimony of Dr. Daniel Bruning).

The IRS has spent countless hours unraveling Davison's tax-fraud schemes. For example, revenue agent Renato Quiason testified that he spent approximately 2,000 total hours unraveling the web of entities, payments and deductions set up by Davison for Kenny Thomas and Kelly Thomas, who are only two of Davison's hundreds of clients. (Tr. 1238:13-16). Quiason testified about his examination of the Thomas' numerous tax arrangements, including an ESOP-S, Roth IRA-C, and sham 412(i) pension plan, that Davison had advised them to establish. (Tr. 1195:11-1196:17; 1197:2-1208:6; 1228:24-1237:20; PX 231-324). During this examination process, Quiason reviewed the tax returns for the numerous management companies established to effect these arrangements, as well as the tax returns for their operating company, Olathe Toyota, and their individual tax returns. Quiason discovered a complicated web of payments for purported management services between the dealership and various management companies. (Tr. 1208:11-1212:3; PX 321). Each purported management fee payment to one of the various management companies reduced the dealership's taxable income. (Tr. 1212:4-15.) There was no evidence that the management companies performed any sort of services for the dealership in order to justify the exorbitant fees paid to them, or the large corresponding deductions taken by the dealership. (Tr. 1217:8-1223:20.) Kenny and Kelly Thomas reduced their total tax liability by hundreds of thousands of dollars during the 2002-2004 tax years.

Revenue agent Carlson audited Davison clients, Zaslavsky and Buterin, who maintained three separate unlawful tax arrangements: the parallel C arrangement, ESOP-S arrangement, and a sham 412(i) pension plan arrangement. (Tr. 795:24-812:5; PX 310). In addition, Buterin also maintained a Roth IRA-C arrangement. (Tr. 809:19-810:7). In order to effect each tax-fraud scheme, Davison directed the formation of management companies. Carlson examined the tax returns for each of these management companies, Buterin and Zaslavsky's operating business, Country Hill Motors, and also each client's individual tax returns. Carlson also examined the books and records (or lack thereof) of the management companies, and the actual books and records of the operating business. Carlson's review concluded that not one of these management companies performed any services, conducted any business, adhered to any purported management agreement or otherwise had any business purpose. (Tr. 806:12-807:8; 820:25-821:8; 822:17-823:6; 825:10-826:7; 827:2-25; 828:8-17; 844:3-17). Here, Davison's tax-fraud schemes fraudulently reduced Buterin and Zaslavsky's reported tax liability by more than $2 million between the 2004-2006 tax years alone. (Tr. 847:12-849:4).

Michelle Paschke testified for a number of hours about another complex tax-fraud scheme. John Cimpl, one of Davison's clients, maintained a Roth IRA-C arrangement. Cimpl had a management company, BLHAT, that performed no management services. (Tr. 1069:11-21). Paschke examined Cimpl's individual tax returns, BLHAT's corporate tax returns and its purported books, records and bank statements. (Tr. 1061:6-12; 1075:14-1076:9; 1077:16-1079:24; PX 318, 319). During tax years, 1999-2002, Cimpl deducted management fees purportedly paid to BLHAT each year. In actuality, BLHAT received no management fees and performed no management services. In fact, the only funds reflected on BLHAT's general ledger were from an installment payment that

Cimpl made on an outstanding promissory note owed to his father that concerned a transaction wholly unrelated to BLHAT's purported business purpose. (Tr. 1062:17-1065:23; 1068:3-10; PX 318). At Davison's direction in 2001, Cimpl also funded a Roth IRA that was the sole shareholder of BLHAT, even though Cimpl's adjusted gross income exceeded the $160,000 statutory limit for each year that he maintained the Roth IRA. (Tr. 1079:25-1081:7; 1088:2-1089:11; PX 315).

Richard Troester testified about a number of tax-fraud schemes and his audits of several Davison clients, including 1) Tom Lauerman who had executed sham flock contracts and who also claimed an artificially inflated basis in shares of stock he owned in a company he sold in 2002 (Tr. 493:2-25; 503:6-504:1); 2) David Lukens who executed sham flock contracts and claimed bogus small-farm related deductions on his tax returns (509:21-513:3; 521:25-522:25); 3) Robert McGannon who maintained a Roth IRA-C arrangement (Tr. 592:2-12); and 4) Philip Kneibert who maintained a series of sham management companies. At Davison's direction, Kneibert's salary of $490,000 for the 2001 and 2002 tax years from his mortgage lending business was re-characterized as purported management fees that had been paid to PhilBiz, one of Kneibert's sham management companies. (Tr. 547:25-548:10; PX 308). PhilBiz claimed $490,000 as income for the tax year ending on November 30, 2002, and offset all but $75,000 of this purported income with purported expenses. (Tr. 550:2-16). A total of $415,000 was deducted in so-called expenses; $368,000 of these expenses were purported management fee payments purportedly paid to another Kneibert management company called BISOA25, which was an S corporation (pass-through entity). (Tr. 550:2-16; 551:14-23). Although $368,000 in expenses were deducted and purportedly paid to BISOA25, none of these funds were ever transferred to BISOA25, which had no bank account or business purpose. (Tr. 550:17-551:13).

BISOA25, in turn purportedly paid a total of $200,000 in management fees, split equally among four purported management companies, so as to leverage the 15% corporate tax rate, which goes up for corporate income above $50,000. (Tr. 552:2-19). One of these four companies was purportedly owned by Kneibert, one company was purportedly owned by Kneibert's wife, and two management companies were purportedly owned by Kneibert's minor children. (Tr. 551:14- 23). None of these companies had a business purpose or bank account either, and thus, never actually received any funds. (Tr. 552:2-15). In short, six different sham entities allowed Kneibert to report only $33,000 in income for the tax year ending November of 2002 when his total compensation for that tax year was actually $490,000. (Tr. 561:17-562:10).

Davison has worked hard to evade IRS detection. He has promoted deliberately complex tax-fraud schemes. He has expressed a willingness to change to new and different tax-fraud schemes when faced with heightened IRS scrutiny of older schemes. For example, James Adler explained what happened when he questioned Davison about the probable longevity of the Roth IRA-C arrangement: "I remember specifically saying to [Davison] what about when the IRS closes the loophole on this [the Roth IRA-C arrangement]? What's going to happen? And he said, we'll come up with another way to do this . . . He said, we'll come up with something else." (Tr. 641:10-642:1). And Davison did precisely that when the ESOP-S arrangement came under heightened scrutiny and when single participant ESOPs (which benefit only one employee of a company with numerous employees) were challenged by the Internal Revenue Service.  Davison encouraged his clients to unwind their sham ESOP-S arrangements and to instead establish sham 412(i) plans; he acknowledged this strategy to revenue agent Carlson when she interviewed him in his capacity as power of attorney for Yans Zaslavsky and Joshua Buterin during their audit. (Tr. 818:6-15).

Zaslavsky and Buterin, in turn, confirmed that Davison recommended the sham 412(i) pension plan and advised them that it was a good and legal way to save for the future. (Tr. 477:8-14; 485:20-22; 486:16-21;478:3-7; 479:17-19). Philip Beard, another Davison client who maintained an ESOP-S arrangement, testified that Davison also recommended a replacement tax-fraud scheme to him; Beard, however, declined to follow Davison's advice. (Tr. 1290:15-23; 1291:12-25).

In a further effort to obfuscate the facts of his tax arrangements and tax advice, Davison also fabricated records, prepared documents after the fact to address IRS concerns, and intentionally provided false information to the IRS during audits and examinations of his clients. For example, Brandy Wheeler, his former colleague at Womack's enterprises testified that at Davison's direction she helped him create documents after the fact and otherwise falsify documents, including management agreements, promissory notes, documents reflecting transactions between banks, and flight manifest logs. (Tr. 981:21-982:18; 982:11-983:4). Davison also directed Wheeler to manufacture a sham promissory note and bogus flight manifest logs (Tr. 987:8-988:9; 992:22 - 994:9). Davison directed the fabrication of other documents, as well, such as documents designed to give the appearance that funds had actually been moved between bank accounts and companies, in order to disguise paper transactions. (Tr. 970:4-21; 970:25-971:1; 971:9-11; 994:16-995:8.).

Davison deliberately disguised the nature of his work and his base of operations. Davison never advertises the fact of his tax advice or the specific tax arrangements he has long promoted. Rather, he has purported to provide business planning advice. At Grant Thornton, he was a self-described "rainmaker" who met with clients, learned about their particular businesses, "looked at their situation and gave them recommendations," usually concerning their participation in one or more tax arrangements. (Tr. 182:14-24). While he was at Grant Thornton as a partner in the tax

group, Davison executed a partnership agreement that included a non-compete clause. (Tr. 180:24-181:15; 187:19-188:1). Nevertheless, Davison designed his post-Grant Thornton life so as to enable him to continue providing tax advice to his clients, notwithstanding this agreement. After Grant Thornton, Davison went to work for Cheryl Womack's enterprises where he worked the equivalent of a four-day work week, in order to devote one work day to his clients from Grant Thornton. (Tr. 189:8-16; 192:12-17). Davison also worked with Womack to found a bookkeeping operation, where he provided clients with tax advice.

Since leaving Grant Thornton, Davison also has provided tax advice by working through a loose network of four accounting firms, each of which was founded by a young accountant who had worked with Davison and his clients at Grant Thornton. (Tr. 183:25-186:4). In 2001, these accountants – Ruth Donovan, Charlie Hubbard, Tami Hughes and Heather Larsen – also left Grant Thornton and established their own firms. (Tr. 193:222-194:10; 206:23-207:7). By virtue of their relatively junior status at Grant Thornton, none of these accountants had executed a non-compete agreement. (Tr. 193:8-19). In 2001, many of Davison's clients moved their business to one of these four firms, and Davison also referred his clients to these firms. (Tr. 210:7-12, 14-15). Indeed, when Hubbard founded his firm, Alexander Key in 2001, nearly seventy percent of his clients were Davison clients, and when Larsen founded J. Larsen and Associates around the same time, nearly one hundred percent of her clients were Davison clients. (Tr. 210:14-20; 680:9-19; 892:23-893:12). Similarly, between 2001 and the present, nearly all of the tax returns that Donovan has prepared through her firm, Ellen Financial Services, were for Davison's clients. (Tr. 23:16-24:12). When Tami Hughes founded her bookkeeping firm, B.I. Services of America, Davison owned a 50% interest in the firm; he currently retains a 1% interest in the firm. (Tr. 216:5-18).

Davison has billed clients for his tax advice through each of these firms. Moreover, since 2001, Davison has even received 10% of the proceeds that his clients generate for Larsen's firm. (Tr. 211:2-25). Davison still provides Hughes with a time sheet that reflects the time he has spent providing tax advice to clients through B.I. Services of America, where Davison is considered a "tax guru." (Tr. 217:2-5; 218:8-12). Hughes pays him up to $250 an hour for the tax advice he provides to clients. (Tr. 451:6-17). He maintains a desk at B.I. Services and uses that firm's offices for his client meetings. (Tr. 438:23-439:11). He has used this bookkeeping-services firm as a perch from which to provide tax advice and promote tax-fraud schemes. For example, he even wrote a so-called white paper that purported to lend support to the inflated basis in shares of stock that Tom Lauerman claimed on his 2002 tax return. (Tr. 219:17-220:23). Davison introduced Buterin and Zaslavsky to the sham 412(i) pension plan through the auspices of B.I. Services (Tr. 453:12-14; 472:4-473:8). Buterin testified that he met Davison at B.I. Services, but understood that Davison was the person who was "overseeing what was going on," with this tax arrangement. (Tr. 484:25-485:6). Kneibert similarly worked with Davison in this manner. Davison crafted Kneibert's multi-tiered sham management company arrangement, and B.I. Services prepared Kneibert's tax returns and helped incorporate his sham management companies. (Tr. 1335:1-8; 1337:9- 1338:16; 1338:22-1339:15; 1339: 22-1340:23; 1342:13-15).

Davison also has provided advice through Womack's bookkeeping-services company. For example, Daniel Bruning, a Davison client whose medical practice's books were managed by this bookkeeping company, explained that Davison was "apparently at the time [2003] . . . used by VCW Accounting for consultation in tax matters and that's where we became acquainted." (Tr. 923:12-18; 934:1-7: 935:13-17). At Davison's direction, Bruning established a short-lived management

company, which Bruning believed was intended to "alleviate tax liabilities." (Tr. 937:6-13; 939:25-940:12; 941:13-942:13). Similarly, Bruning's partner, Kimber Eubanks also ended up working with Davison under the same circumstances and Davison also advised Eubanks to establish a management company and also a Roth IRA-C arrangement, the latter of which Eubanks declined to do. (Tr. 950:24-951:11; 953:18-23; 954:20-955:16).

Davison avoids signing tax returns or executing engagement letters, and none of his clients maintain businesses that are publicly-traded companies. (Tr. 222:6-20; 223:15:224:10). Essentially, there is little, if any, documentary proof of Davison's involvement in these tax arrangements. Thus, for this reason, too, it is especially difficult and time-consuming to ascertain the origins of his tax-fraud schemes. Davison's numerous, complex, ever-changing, tax-fraud schemes and his deliberate efforts to disguise his true involvement in the promotion of these tax-fraud schemes have required the IRS to expend a "staggering" amount of resources on discovering and combating these schemes. If this outlay of resources continues – and it almost certainly will continue in the absence of an injunction barring Davison from offering tax advice without significant restraint, then these resources will not be available to service honest tax paying Americans. Nor will these resources be available to investigate other promoters of tax-fraud schemes.

In considering the harm that Davison has caused to the government against the harm that will be suffered by Davison if he is enjoined in his ability to give tax advice, it is noted that Davison is a licensed attorney and has significant business interests separate and apart from his income derived by rendering tax advice.

In 2008, Davison's total income from the tax-related advice that he provided was approximately $100,000 that year. (Tr. 203:3-8). In 2009, he earned about the same amount from

his tax-related advice. As he explained during his June 2009 deposition and confirmed at trial, as of the date of that deposition, he had earned approximately $50,000 in fees relating to his tax advice, and he was on target to earn approximately $100,000 for the 2009 year. (Tr. 203:3-8).

In contrast, Davison testified that he receives approximately $280,000 in annual income from non-tax-related work. (Tr. 202:20-203:2). Davison receives about $3,500 a month for his work on the administrative committee of Freemont Farms, a large Iowa-based, egg-producing farm, and between $22,500 to $40,000 each quarter for his partnership distribution from Freemont Farms. (Tr. 196:6-17). Davison also owns rental properties in Las Vegas, Kansas City and Louisiana and farm land in Nebraska. He receives a steady monthly income from his ownership interest in these properties. (Tr. 198:13-200:4). Finally, Davison co-owns with Tami Hughes, an Internet payday loan business from which he receives approximately $3,000 each month. (Tr. 197:8-25). None of these endeavors appears to relate to the provision of tax advice. Any harm that Davison would suffer from an injunction restricting his ability to offer tax advice is clearly outweighed by the potential for overwhelming continued harm to the government and the public interest in the absence of an injunction.

Davison contends that his associates or his clients are responsible for the sham entities used to effect his tax-fraud schemes. Davison testified that he has advised clients about numerous tax arrangements, sold them these arrangements and then passed clients to one of his associates, who was then charged with establishing the management companies necessary to effect these arrangements. (Tr. 287:24-288:7). Davison contends that he has never attended to the so-called corporate "details," which are indicia of a legitimate company, such as ensuring that each alleged entity maintained separate sets of books, employees, and office space. (Tr. 279:21-280:15). He does

not believe that this was ever his responsibility, and he says he assumed his associates or clients handled these details. (Tr. 280:3-18; 281:1-12; 285:16-20). Davison even acknowledges that when a company neglects such details, the company starts to look like a sham entity. (Tr. 283:15- 284:1; 285:16-20). Numerous Davison clients testified about their lack of accounting expertise, including Yans Zaslavsky and Josh Buterin, who co-own a used car dealership (Tr. 475:9-24; 483:5-14); James Adler, who is an attorney (633:1-23); Philip Kneibert, who owns a home mortgage lending business (1336:5-19); Daniel Bruning and Kimber Eubanks, who co-own a medical practice (Tr. 932:13-933:23; 949:19-950:21); Kelly Thomas, who co-owns an automobile dealership (Tr. 1349:6-9); and Philip Beard, who owned a healthcare consulting firm (Tr. 1284:23-1285:9). Yet, Davison advised every single one of these clients to create at least one management company, and contends that he never confirmed, even once, that any of these companies performed actual services because he claimed it was not his responsibility to ensure that any of his client's companies conformed to even the most basic corporate formalities.

The record, however, shows that Davison was very much involved in and responsible for such details. Davison advised his clients to incorporate their management companies in Nevada, where there is no state income tax. NMN, a company in which Davison owns a 30% interest, incorporated these companies in that state. (Tr. 254:12-255:24; 258:7-10). In an email to his-then employer, Cheryl Womack, Davison, in a candid acknowledgment of what was going on, described NMN as an company that was "responsible for window dress[ing] the companies in Nevada." (PX 9; Tr. 257:19-258:3). Ruth Donovan, who also co-owned NMN along with Charlie Hubbard and his wife, testified at trial, via deposition, that she was primarily responsible for completing the paperwork associated with the incorporation of these management companies. (Donovan Dep. Tr.

63:24-65:8; ). She completed this paperwork at Davison's direction. (Dep. Tr. 112:23-113:21). Although Donovan was usually the management company's only officer and director, she often had no idea what the purported business of these companies was; Davison, she testified, made these decisions. (Dep. Tr. 71:9-72:16; 101:1-7). Donovan similarly never confirmed whether any of these companies actually performed any services. (Dep. Tr. 119:18-120:3). Indeed, Donovan testified that she assumed that clients "had been told to set up a management company," and that "they had been talked to about what needed to be done" by Davison. (Dep. Tr. 119:18-120:3). She had attended meetings with Davison and clients during which time he had explained to clients the mechanics of forming a management company. (Dep. Tr. 123:18-124:16). Davison, in turn, has acknowledged that he drafted many of his clients' purported management agreements (supposedly in force between that company and the operating business). (Tr.337:7-338:3) Donovan, who was the only designated officer and director for most of these management companies, signed and completed purported corporate minutes for Davison's clients by filling out a blank template form, at Davison's direction. (Dep. Tr. 76:14-79:24; 85:1-13). Indeed, Donovan acknowledged the sham nature of this endeavor, as she noted that she could have held these so-called corporate meetings "in [her] head." (Dep. Tr. 225:6-15).

Davison's other associates also acted at his direction. For example, Heather Larsen helped set up Kenny and Kelly Thomas' sham 412(i) plan. (Tr. 901:19:902:3). Larsen, however, could not actually explain any of the plan details, including why an entirely new company was formed to sponsor the 412(i) plan. (Tr. 903:2-8; 1328:14-22). At trial, she conceded that she did not even understand the 412(i) arrangement and that "to the extent she was involved at all with the 412(i) plan that the Thomases [sic] implemented, that was really through Mr. Davison." (Tr. 1328:19-21).

Kenny Thomas confirmed that Davison had been the person who introduced him to this arrangement and advised him to establish a management company for the 412(i) plan and for other tax arrangements. (Tr. 1351:20-1355:9; 1356:17-1360:12). Indeed, Larsen later sent the IRS a letter asking to "formally distance [her]self" from her prior role as power of attorney for Kelly and Kenny Thomas' audit relating to the sham 412(i) plan. (Tr. 1325:1-18; PX 195).

Tami Hughes also has worked with Davison's clients at his direction to help them establish numerous tax arrangements, none of which she truly understood, as her trial testimony made clear. She explained that her nominal understanding stemmed only from Davison's research memoranda or verbal explanations. (Tr. 454:4-15; 455:24-456:3; 456:17-22). For example, when Hughes incorporated Kneibert's numerous management companies at Davison's direction, it was Davison who determined and controlled those details. (Tr. 229:1-230:21;1339:12-1340:23; 1345: 24-1346:6). Davison acknowledged as much at trial when he testified about the specific details of Kneibert's sham management companies. (Tr. 229:1-230:21; PX 1). Indeed, Davison clearly knew about and controlled the so-called details.

Davison deliberately advised his clients to break the law, and helped them go about doing so. For example, Davison has repeatedly insisted that the Roth IRA-C arrangement, which he actually introduced to his associates and clients while still employed at Grant Thornton, is a legal arrangement. (Tr. 295:24-296:6). He did so even though, by Davison's own admission, the arrangement's structure violates Code provisions that regulate Roth IRAs. For example, Roth IRA contributions are made with after-tax dollars, meaning these contributions are not tax deductible. *See* I.R.C. §408A. Davison acknowledges this aspect of the law. (Tr. 294:21-295:3; 1378:14-24; 1379:2-13). Roth IRA contributions are also subject to an excise tax of 6% if the owner of the Roth

IRA's adjusted gross income exceeds the statutory limit in any given year. I.R.C. §408A. Davison also acknowledges this. (Tr. 295:4-23; 1378:10-11). Yet, his Roth IRAC arrangement follows neither of these rules. Roth IRA contributions are disguised through the purported payment of management fees; by design the owner of the Roth IRA deducts these contributions. Davison's clients, such as John Cimpl and Robert McGannon, maintained Roth IRAs and contributed to these accounts, even when their adjusted gross incomes exceeded the statutory limit, and his clients paid no excise taxes. (Tr. 534:19-537:13; 540:23-541: 19; 1088:2-1091:15; PX 318).

Davison's tax arrangements flout other provisions of the Code, as well. For example, the 412(i) sham pension plan arrangement contradicts what Davison has described as the Internal Revenue Code's "aggregation rules," which govern whether a qualified plan properly covers the employees of a particular company. (Tr. 356:11-14). Davison testified that control group and affiliated service group rules, as defined in the Internal Revenue Code, apply to qualified plans, including ESOPs and 412(i) plans. (Tr. 344:17-352:24). Indeed, Davison even wrote at least one memorandum on this subject. Davison's memorandum explains that the pertinent aggregation rules consider employees of operating companies and management companies to belong to the same group of companies for purposes of assessing whether a qualified plan provides adequate coverage and comports with the Code's provisions. (Tr 344:17-352:24; PX6 at 34-40 ). His memorandum explains that the "management company group affiliations is meant to combat situations where 'a management company is set up which retains control of the operating company, and yet provides different benefits for the owners or highly paid employees. Congress wanted to preclude individuals from forming separate companies with no ownership synergies but who still maintain management control over the operating company." (PX 6 at 40). His memorandum also analyzes how qualified

plans must cover both rank-and-file employees and highly-compensated employees. (Tr. 354: 1-355:11; PX at 39-40). Nevertheless, Davison promoted the sham 412(i) plan arrangement and flouted these very Code provisions. He emailed one client, Daniel Bruning and told him that although Bruning's financial advisor was "concerned that [Bruning's C corporation] may provide management services and be included as an affiliated company with" Bruning's medical practice, this was not a concern to Davison. (PX 12). Davison advised Bruning that if his C corporation was treated as a management company, then "this would mean all Pain Care employees would be included in the 412(i) plan (not the desired result)." Instead Davison advanced an "opinion [that] the C corp provides administrative services and not management services and is not part of an affiliated group." (PX 12). Davison, however, also testified that Bruning's C corporation was previously referred to as a management company in an email sent by Ruth Donovan, who, at Davison's direction, had incorporated that same company for Bruning. (Tr. 361:6-363:9; PX 11, 12).

Nevertheless, Davison advised Bruning to simply describe his company in a different manner; Bruning declined to follow Davison's advice.

Section 6707(a) of the Code makes it clear that a person who is a material advisor as to a listed transaction must disclose to the IRS his or her role in promoting that arrangement. I.R.C. §6707(a). "[I]f a person who is required to file a return under section 6111(a) with respect to a listed transaction" fails to make this disclosure, that individual is assessed with a penalty. I.R.C. §6707(a). Section 6111(a) defines "material advisor," as being a person who provides "material aid, assistance, or advice" with respect to the organizing, establishing or selling of a listed transaction, and has earned at least $50,000 from these efforts. *See* I.R.C. §6111. At the very least, the record shows that

Davison was required to disclose his role in promoting the sham 412(i) arrangement. Davison made no such filing. (Tr. 105:5-17).

Davison has acknowledged that this tax arrangement is a listed transaction pursuant to Revenue Ruling 2004-20. (Tr. 363:10-364:2). Nevertheless, Davison contends that he did not know that he was required to disclose his role as a material advisor, because he was informed that the 412(i) plan that he promoted was not a listed transaction, by Economic Concepts, Inc. (ECI), the plan administrator. (Tr. 364:3-17).

The record tells a different story. Davison actually received an email from ECI announcing that on February 22, 2005 (shortly after the release of Revenue Ruling 2004-20), the company was holding a series of teleconferences on the question of whether the 412(i) plan that it administered and that Davison promoted was a listed transaction. (Tr. 365:25-367:25; PX 164). Davison acknowledges that he received notice of this teleconference and that he chose not to participate in the event. (Tr. 371:4-20). He acknowledges that this teleconference that ECI convened was its effort to address Revenue Ruling 2004-20 and the consequences of that ruling. (Tr. 371:16-20). The email announcing this teleconference also included attachments, including a half-completed 8886 Form which is the disclosure form that material advisors of reportable transactions, including listed transactions, must file with the IRS. (PX 164; Tr. 371:21-372:4).

Davison also sought and received advice from the IRS on this question. He conferred with Teresa Calvert, an IRS revenue agent who is a specialist in employee plans (including 412(i) plans). Calvert audited the 412(i) plan that Kenny and Kelly Thomas maintained, and for whom Davison was power of attorney. (Tr. 1324:25-1327:6; DX 41). In her examination of the Thomas' 412(i) plan, Calvert actually noted that their particular arrangement was a listed transaction, for precisely those

reasons listed in Revenue Ruling 2004-20, namely that the Thomas' 412(i) plan was funded with life insurance contracts that provided benefits in excess of what the 412(i) plan document stated. (Tr. 1388:17-1389:17). Davison has even admitted that Calvert's analysis of the Thomas' 412(i) plan identified the same issues identified in Revenue Ruling 2004-20. (Tr. 1389:14-17). To this end, Davison asked Calvert whether the 412(i) plan that he was promoting was considered a listed transaction under Revenue Ruling 2004-20, and in a separate follow-up letter and phone call, she confirmed that the plan was a listed transaction. (Tr. 1385:7-1386:3). Thus, Davison received input from the plan administrator, ECI, and from the IRS, that his 412(i) arrangement was considered a listed transaction, and yet, he still never filed any disclosure form with the IRS. (Tr. 1387:1-12).

Davison also knew that he was a material advisor within the meaning of I.R.C. § 6111. Hartford Life Insurance, which did file a disclosure form with the IRS, noted on its disclosure that it had paid Davison substantial commissions for his sales of life insurance policies used to fund the sham 412(i) plan. (Tr. 105:18-106:18). Indeed, Hartford paid Davison more than $100,000 for his sales of insurance policies, and as Davison testified, the largest portion of commissions he received from his efforts at selling insurance (he has a Kansas insurance license) came from his sales of life insurance policies used to fund the sham 412(i) plans. (Tr. 340:2-341:14). The threshold payment is $50,000 for listed transactions. *See* I.R.C. §6111 (as amended 2004). Furthermore, two of Davison's clients, Joseph and Salvatore Paris, filed disclosure forms as well, informing the IRS that they each had maintained a 412(i) arrangement and that Davison was their material advisor as to this arrangement. (Tr. 106:19-112:13; 370:6-22; PX 201, 202).

Davison drafts purported flock contracts for his clients. (Tr. 398:21-399:4). He argues that by executing these agreements, his clients become farmers, who are eligible to claim deductions for

the cost of purchasing a flock of layer hens during the tax year in which that cost is incurred, pursuant to Revenue Ruling 60-191. (Tr. 412:10-20; PX 165). That revenue ruling provides "that farmers employing the cash method of accounting may deduct the cost of baby chicks and egg-laying hens in the year of payment therefor, provided such method is consistently followed and clearly reflects income." Rev. Rul. 60-191. But the revenue ruling applies only to farmers within the meaning of the Code.

As common sense suggests and the Treasury Regulations make clear, merely executing a flock contract of the sort at issue here does not make a person a farmer. Treasury Regulations define who is a farmer: "A taxpayer is engaged in the business of farming if he cultivates, operates, or manages a farm for gain or profit, either as owner or tenant. For the purpose of section 175, a taxpayer who receives a rental (either in cash or in kind) which is based upon farm production is engaged in the business of farming. However, a taxpayer who receives a fixed rental (without reference to production) is engaged in the business of farming only if he participates to a material extent in the operation or management of the farm." Treas. Reg. §1.175-3. Notwithstanding the Treasury Regulations, Davison maintains that when his clients execute a flock contract with fixed payments, they purchase flocks of layer hens and thus incur the risks inherent in owning these birds and are thus farmers within the meaning of the Code. (Tr. 411:1-8; 412: 5-20; PX 165). Neither of these contentions is true or legally relevant.

When Davison's clients execute these flock contracts, they are not actually purchasing a flock of layer hens. For example, revenue agents Ley and Troester reviewed numerous audit files of Davison clients who executed flock agreements, and despite asking for them, neither revenue

agent ever saw even one invoice or other form of documentation showing that a client had actually purchased a flock of layer hens. (Tr. 56:2-24; 512:2-513:1; 519:12-520:21).

Furthermore, even if executing the flock contract did confer ownership rights, this fact alone would not transform Davison's clients into farmers. Rather, his clients would simply be renting these flocks of layer hens for a fixed rate of return, and Treasury Regulations make it clear that taxpayers who receive fixed rates of return on farming-related endeavors, "without reference to production," must be engaged to "a material extent in the operation or management of the farm" in order to be called a farmer. Treas. Reg. §1.175-3. Davison's clients are not involved in the management of any farm, simply because they execute flock contracts. Davison's clients never have any control over or involvement in the farming process, as David Lukens testified at trial. Davison drafted flock contracts for Lukens, who is a self-employed insurance salesman. (Tr. 425:17- 427:22; PX 95; 185). Lukens, however, never even saw the layer hens, did not purchase their feed, did not purchase their shelter, and did not know whether he was paying a fair price for the hens. (Tr. 782:1-17; 784:15-786:18). None of Davison's flock contracts mention specific growing conditions of the birds. (*See e.g.*, PX 95, 182, 185). In contrast, in *Maple Leaf Farms, Inc. v. Commissioner*, 64 T.C. 438 (U.S. Tax Ct. 1975), the court found that the petitioner, who actually owned a flock of ducks and had executed a duck-growing agreement, was a farmer, because the "petitioner selected and purchased the ducklings and determined all necessary feed and medication required by the growers, who served petitioner exclusively. It retained title to all ducks, feed, and medication while in the growers' possession. It exercised substantial supervision and control over the growing process." *Id*. at 448-49. One condition of the duck-growing agreement was that the petitioner maintain control over this growth process. *Id*. Davison's flock contracts contain no such condition.

Indeed, Davison's purported flock contracts are in substance loan agreements between Davison's client and the farming facility. The client loans the farming facility money in exchange for a promise that he will receive the loaned amount back, plus interest. Calling such a lender a farmer is like a bank calling itself a farmer because it makes loans to farming operations. (Tr. 422:24-423:20; 430:8-15; PX 95, 180, 182, 185). The flock contracts provide a rate of return on investment, regardless of market conditions. In fact, in many instances the client who executes the contract receives all of his money back, plus interest, even before the layer hens have finished laying their eggs. (Tr. 434:22-435:11). Indeed, from Davison's clients' perspective, these flock contracts have all of the benefits of loans and additional benefits, as well. Unlike with loans, here, Davison's clients deduct the full amount of their loans because Davison falsely advises them that they can call their loans flock purchases and call themselves farmers. (PX 165).

Courts have rejected similar attempts by taxpayers to claim farming-related deductions. For example, in *Ward AG Products v. Commissioner*, T.C. Memo. 1998-84, 1998 WL 79879 (U.S.Tax Ct., Feb. 26, 1998), the court held that the petitioner, which sold fertilizer and seeds to farmers, was not a farming business and not entitled to use the cash basis method of accounting. The court held that in order to be designated a farmer, a taxpayer "must have participated to a significant degree in the growing process and borne a substantial risk of loss from that process," and specifically found that the petitioner had not borne this risk. *Id*. at *5. Unlike farmers, who have no recourse if their crops fail or market conditions are harmful, the petitioner had liens, security interests and other means of protection against loss, just as Davison's flock contracts guarantee a return on investment, regardless of market conditions. *Id*. at * 5.

Davison promotes these flock agreements, notwithstanding the law. Davison has a monetary interest in having these contracts executed. For example, Davison drafted a flock agreement for his client, Tom Lauerman, in which Lauerman purportedly purchased a flock of layer hens to be raised at Freemont Farms, an entity that Davison helps manage and from which he receives approximately $140,000 a year in payments. (Tr. 419:6-420:3; PX 180). Davison also signed (and possibly drafted) a document in which Lauerman agreed to assign his purported interest in these layer hens to Davison's entity, Cedar Valley Bird Company, which also serves as a third party broker that receives a 3% commission on the funds exchanged in connection with the flock contracts that Davison also drafts. (PX 181; Tr. 400:15-405:22; 408:15-19). Davison actually knows that his flock contracts do not reflect the real risks involved in raising layer hens and that his clients do not actually purchase layer hens when they execute these agreements. He also knows that even if they did purchase layer hens, that fact alone, would not entitle his clients to claim a farming-related deduction. Davison candidly testified that his flock contracts are like "renting a piece of real estate," as opposed to owning the property. (Tr. 436:2-437:4). Yet, he contends that his clients purchase layer hens, that the risk of ownership is inherent in his flock contracts, and that this enables his clients to call themselves farmers.

Davison's numerous, exceedingly complex tax fraud-schemes have caused great harm to the government and to the public fisc. He has promoted these arrangements with a reckless disregard for the law and refused to accept responsibility for his conduct. He routinely falsely and fraudulently advised clients that his tax arrangements were legal.

The Government requests the Court permanently enjoin Mr. Davison "from providing any tax advice" to any person in the future pursuant to I.R.C. § 7402 and argues that such a broad

injunction is constitutionally permissible. (Doc. # 104, p. 6). Mr. Davison argues such a "broad preemptive injunction certainly violates [his] First Amendment right to free commercial speech." Unfortunately, neither parties' assertions regarding the constitutionality of such an injunction is completely accurate.

As previously referenced, in relevant part, I.R.C. § 7402(a) states, "[t]he district courts of the United States . . . shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction. . . necessary or appropriate for the enforcement of the internal revenue laws." This remedy does provide district courts broad discretion to prohibit a wide range of conduct that impedes enforcement of the internal revenue laws, but I.R.C. § 7402 may not be used by a court in a manner that would infringe upon rights guaranteed under the Constitution. *See Marbury v. Madison*, 1 Cranch 137, 176 (U.S. 1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written . . . It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act."). In this case, the issuance of an injunction permanently barring Mr. Davison from offering tax advice, regardless of whether such advice comports truthfully and honestly with internal revenue laws, would affect Mr. Davison's right to freely speak, a right generally protected under the First Amendment. Thus, the question becomes whether such an injunction would violate Mr. Davison's First Amendment rights.

Generally, the First Amendment "prevents government from proscribing speech, . . . or even expressive conduct, . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382-383 (1992) (citations omitted). "Restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny," which requires the government

to demonstrate that the regulation protects or promotes a substantial state interest and the restriction represents the least restrictive means of protecting or promoting the state interest. *Ysursa v. Pocatello Educ. Ass'n*, – U.S. –, 129 S. Ct. 1093, 1098 (U.S. 2009) (quoting *Davenport v. Wash. Ed. Ass'n*, 551 U.S. 177, 188 (2007)); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). However, not all speech is entitled to protection under the First Amendment, and the Supreme Court has taken a limited categorical approach to exclusion. *See e.g. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues."); *Rother v. United States*, 354 U.S. 476 (1957) (obscenity); *Beauharnais v. Illinois*, 343 U.S. 250 (1952) (defamation); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ("fighting words").

Prior to 1975, one other category of speech was excluded from the protection of the First Amendment: commercial speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64 (1983). Beginning with *Bigelow v. Virginia*, 421 U.S. 809 (1975), the Supreme Court has extended some protections of the First Amendment to commercial speech. *Bolger*, 463 U.S. at 64. However, the Court has stated that "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Id.* at 64-65. For example, the First Amendment "does not protect commercial speech about unlawful activities." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 497, n.7 (1996). Further, due to the "greater potential for deception or confusion[,] . . . content-based restrictions on commercial speech may be permissible." *Bolger*, 463 U.S. at 65. Content-based restrictions on commercial speech are reviewed under intermediate scrutiny, and if the communication being restricted is neither misleading nor related to unlawful

activity, (1) the state actor imposing the restriction must "assert a substantial interest to be achieved" by the restriction; (2) the restriction must directly advance that interest; and (3) the restriction must not be more extensive than is necessary to protect the substantial interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).

In this case, because the "degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech," it must be determined whether a permanent injunction completely barring Mr. Davison's ability to offer tax advice or services would constitute a restriction of commercial speech, non-commercial speech, or a mixture of each. *Bolger*, 463 U.S. at 65. The line separating commercial speech from non-commercial speech has not yet been clearly drawn. At its core, commercial speech consists of "speech proposing a commercial transaction." *Cent. Hudson*, 447 U.S. at 562. Almost all cases reviewed by the Supreme Court have involved commercial expressions in the form of commercial advertisements for the sale of goods or services. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989); *44 Liquormart*, 517 U.S. at 497. However, in *Bolger*, the Supreme Court indicated that commercial speech is not limited to pure commercial advertising that does no more than propose a commercial transaction. 463 U.S. at 65. In *Bolger*, there was a question of whether certain mailings consisting of "informational pamphlets discussing the desirability and availability of prophylactics in general or [a specific corporation's] products in particular," fell within the category of commercial speech *Id.* at 62. The pamphlets did more than merely propose commercial transactions, although they were designed to be advertisements and were conceded by the parties to the action to be advertisements. *Id.* at 66. The Court viewed the pamphlets in their totality to arrive at a conclusion that a combination of three

factors - advertising format, product references, and commercial motivation - provided "strong support" for classifying the pamphlets as commercial speech. *Id.* at 67. The Court made clear, however, that it was the combination of all three of the factors that led to the classification and that pamphlets may have been classified differently had one or more of the three factors not been present. *Id.*

In this case, a permanent injunction completely barring Mr. Davison from ever again offering any tax advice or service would constitute such a broad restriction that both Mr. Davison's non-commercial free speech and commercial free speech rights would be implicated. Such an injunction would effectively prohibit Mr. Davison from advertising or otherwise promulgating forms of expression intended primarily to merely propose commercial transactions involving the tax laws, thus implicating commercial free speech rights. The injunction would also prohibit Mr. Davison from offering tax advice or expressing his opinions of tax related matters that have no relation to advertising in the common sense and, under *Bolger's* three part test, would likely fall into the category of non-commercial free speech.

An injunction that would deprive Mr. Davison of his right to express non-commercial, truthful, non-misleading thoughts, ideas, and opinions regarding the internal revenue laws would be *per se* unconstitutional. *See Davenport*, 551 U.S. at 188. Strict scrutiny review of the injunction would be questionable since speech related to the tax laws does not fit within any of the limited categorical exceptions to First Amendment protection and a complete ban on such speech may not be the least restrictive means of protecting the internal revenue tax laws. Thus, contrary to the Government's claims, I.R.C. § 7402 cannot confer power upon this Court to enjoin Mr. Davison from offering any advice or service relating to the internal revenue laws because to do so would

impermissibly violate Mr. Davison's right to engage in non-commercial free speech in contravention of the First Amendment. *See Marbury*, 1 Cranch at 176.[1]

The conclusion that a permanent injunction completely barring Mr. Davison from offering any advice or service relating to the internal revenue laws would be improper does not negate the Court's ability to fashion a more limited and more appropriate remedy in this case.

WHEREFORE, for all of these foregoing reasons, Davison is hereby enjoined from organizing, establishing, promoting, selling, offering for sale or helping to organize, establish, promote, sell or offer for sale any tax plan, as addressed herein, involving sham parallel C management companies, sham 412(i) plans, sham flock contracts or any other illegal tax scheme, plan, or device, even if not specifically addressed herein. Additionally, Davison shall not organize, establish, promote, sell, offer for sale or assist in any financial or tax related arrangement without submitting in writing to an IRS designee, a detailed plan explaining the financial or tax arrangement and all steps necessary for the arrangement to be legal under the tax code. The plan submitted to the IRS for approval shall set forth the provisions of the tax code relied upon and the requirements necessary to be undertaken by the client for the plan to function in accordance with all legal requirements. The plan submitted to the IRS for approval shall be signed by Davison. The plan submitted shall also include the signature of the client, individual, or entity wishing to implement such plan, or for whom the plan is proposed, acknowledging the client's understanding of all requirements, conditions and terms of the plan. No such plan shall be implemented by or with the

_____

[1]This is certainly not to say, or in any way imply, that licensing bodies relating to Davison's professional licenses could not choose to take appropriate disciplinary action based upon the findings herein. In this regard, the United States, through its attorney, Allyson Baker, is directed to provide a copy of this Order to the appropriate accounting disciplinary body regarding Davison's license as a CPA.

assistance of Davison within thirty (30) days of submission to the IRS unless IRS approval is granted. If the IRS does not respond within thirty (30) days, Davison and his client may proceed subject to later review by the IRS. The IRS has no affirmative duty to respond to any plan submitted and does not waive the right to challenge any matter submitted by not responding. The IRS shall file with the court the name, address, and contact information for its initial designee within thirty (30) days of this Order. Any subsequent change of designee shall be provided to Davison in writing at the last address given by Davison. It is Davison's responsibility to keep the IRS informed of his address through its designee.

Furthermore, Davison is required to inform the United States within sixty (60) days hereof, through its attorney herein, Allyson Baker, of every client, together with contact information for each client, for whom he has provided any type of tax-related advice or consultation directly or indirectly within the last five years. Davison is also required to provide each such client with a copy of this Order within sixty (60) days. Subsequent hereto, on May 1 of each year hereafter, Davison is required to provide the IRS, through the IRS designee referenced above, a list of all clients, groups, entities or individuals, with whom he has consulted or provided any type of tax advice, assistance, or tax-related guidance within the preceding twelve (12) months, unless and until Davison notifies the IRS designee and provides proof that he has surrendered his license to practice as a CPA and has ceased giving and will not in the future give any financial or tax-related advice, assistance, or guidance in any capacity.

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED: May 11, 2010